**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | CRIMINAL CASE NO. |
| | : | 3:18-CR-00049 (JCH) |
| v. | : | |
| | : | |
| TYMON PETERSON, | : | NOVEMBER 20, 2018 |
| Defendant. | : | |

## RULING RE: MOTION TO SUPPRESS (DOC. NO. 45)

### I.    INTRODUCTION

The defendant, Tymon Peterson ("Peterson"), filed a Motion to Suppress (Doc.
No. 45).  Peterson, who is charged with several drug and firearms offenses, argues that
the government violated his Fourth Amendment rights by (1) unlawfully entering his
home and (2) unlawfully searching and seizing his cell phone.  See Defendant's
Memorandum of Law in Support of Motion to Suppress ("Def.'s Mem.") (Doc. No. 45-1)
at 1.  Peterson seeks to suppress (1) the statements that he made to law enforcement
after they entered his home; (2) the evidence that law enforcement obtained from his
cell phone; and (3) any additional evidence that law enforcement obtained on the basis
of the fruits of their search of his cell phone, including evidence obtained through a
search warrant that was later served on Snapchat.  Id.

On October 23, 2018, the court conducted an evidentiary hearing and held
argument on Peterson's Motion to Suppress.

For the reasons stated below, Peterson's Motion to Suppress is denied.

### II.    BACKGROUND

The court will first provide an overview of the relevant facts.  It will then
summarize the case's procedural history.

A.    Findings of Fact[1]

On September 24, 2017, the general manager of Hoffman's Gun Center ("Hoffman's") called Special Agent Sean Brackett ("SA Brackett"), a law enforcement officer with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF").  The general manager reported that he had video surveillance of a possible incident of firearms trafficking that occurred at Hoffman's on September 22, 2017.  SA Brackett responded by reviewing the video surveillance and interviewing the general manager and several sales clerks at Hoffman's.

According to one of the sales clerks, Peterson entered Hoffman's on September 22, with a person who is known in the Indictment as JW.  JW, who SA Brackett later determined had prior felony convictions, asked the sales clerk about a Kahr Arms pistol and stated, in effect, that "we want one."  The clerk, however, did not permit JW to handle the firearm because JW informed the clerk that he did not have a pistol permit. When SA Brackett reviewed the video surveillance from that day, he saw JW pointing to firearms in a display case and passing Peterson what appeared to be US currency. Peterson, who did possess a valid pistol permit, ultimately purchased the Kahr Arms pistol, along with two other pistols.  As part of this purchase, Peterson completed an ATF Form 4473, in which he certified that he was not buying firearms on behalf of another person.

Peterson and JW returned to Hoffman's on September 23, 2017.  According to the clerk working that day, JW asked about purchasing cheap pistols and indicated that

_____

[1] The court makes the following findings, unless expressly stated otherwise.

Peterson wanted to purchase a Taurus pistol. However, after the clerk discovered that JW did not have a pistol permit, the clerk declined to sell the Taurus pistol to Peterson.

Through his investigation, SA Brackett learned that Peterson had filed a report with the Connecticut State Police, stating that, on September 17, 2017, several men had physically assaulted him and stolen several of his firearms. On September 25, SA Brackett spoke with Trooper Williams of the Connecticut State Police by phone about Peterson's report.

On September 27, SA Brackett, Special Agent Christopher Edwards of ATF ("SA Edwards"), and Bridgeport Detective Dennis Martinez ("Detective Martinez") (collectively, the "officers") went to Peterson's home to interview him about his gun purchases from Hoffman's. At that time, the officers did not have a search or arrest warrant for Peterson. The officers identified themselves at the door as law enforcement, and they asked Peterson if they could enter. As discussed in greater detail below, see, infra, at 10–12, the parties dispute the precise moment when Peterson invited the officers into his home. However, there is no dispute that the officers did eventually enter the home, and that the vast majority of the interview was conducted inside the premises of Peterson's home. Peterson's mother, Vickie Peterson, was also present for much of the interview.

SA Brackett audio recorded the entire interview, apparently without Peterson's knowledge. See generally Government's Exhibit 1, Audio Recording of 9/27/2017 Interview ("Audio"); Government's Exhibit 1T, Transcript of Audio Recording of 9/27/2017 Interview ("Audio Tr."). The officers began the conversation by asking Peterson about the September 17 assault and robbery that he reported to the

Connecticut State Police. Peterson recounted that he had received a ride from New Haven to the Bridgeport area from the friends of a former girlfriend. Peterson stated that, during the ride, the individuals in the car attacked him with a hammer, stole four firearms that he had on his person and in his backpack, and then left him on the side of the highway. Peterson provided SA Brackett with the names of his attackers, as well as printed out photographs of the assailants for the officers.

The officers then asked Peterson whether he had replaced the stolen guns. Peterson told the officers that he had purchased replacements at Hoffman's and at the Newington Gun Exchange. Peterson stated that JW accompanied him to Hoffman's, and that Peterson borrowed money from JW to purchase the pistols from Hoffman's. After further questioning, SA Edwards informed Peterson that they had video footage of JW handing Peterson money and pointing out firearms in the display case that Peterson eventually purchased. The officers stated that JW was a felon, and that purchasing guns for convicted felons and lying on an ATF 4473 Form were federal crimes. They also informed Peterson that a federal prosecutor had been assigned to his case. Peterson repeatedly stated that he did not purchase the three firearms for JW, and that JW merely lent him money to purchase his replacement guns from Hoffman's.

The officers asked where Peterson had stored the recently purchased firearms. Peterson did not provide a location. However, Peterson represented that he could bring the guns to the officers the following morning. Peterson also stated that the firearms had trigger locks on them, and that Peterson possessed the keys to those locks. The officers asked whether Peterson could show them the keys. Although Peterson walked

around his home with SA Brackett in search for the trigger lock keys, he was unable to find them.

Later, SA Brackett asked Peterson if he had any text messages on his cell phone that would corroborate his version of the story. When Peterson showed SA Brackett a text message thread between himself and JW, SA Brackett asked if he could see the phone, took possession of Peterson's phone, and then began videotaping the screen of the phone as he scrolled through text message thread. See generally Government's Exhibit 3, Video Text Thread ("Video"). SA Brackett remarked out loud that he saw conversations about gun purchases and "drug talk" in the text message thread between Peterson and JW.

The officers then asked Peterson to sign a consent form allowing them to seize and search his cell phone. Peterson initially resisted, stating that he did not want them to take his phone. The officers represented that they could legally seize the phone now and secure a search warrant later because they had already seen incriminating evidence on the phone. They further stated that, if Peterson wanted the benefits of being a cooperator, he needed to provide them with the passcode for unlocking his phone. Peterson's phone was an iPhone 6S. Eventually, Peterson provided the passcode and signed a written consent form. The consent form contained the following boilerplate language:

> I understand that I have a right to refuse to give my consent to a search and may demand that a search warrant be obtained prior to any search of the person or property described below.
>
> I understand that any contraband or evidence of a crime found during the search can be seized and used against me in any court of law or other proceeding.

I understand that I may consult with an attorney before or during the search.

I understand that I may withdraw my consent to this search at any time prior to the search's termination.

This consent to search has been given voluntarily without promises, threats, coercion or force of any kind whatsoever.

I have read the above statement of rights, understand these rights, and hereby authorize agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives to conduct a complete search of the property described below.

See Government's Exhibit 3, Consent to Search Form. Shortly after Peterson signed the consent form, the officers left the home with Peterson's cell phone.

On September 28, the day after the interview, SA Brackett brought Peterson's phone to Special Agent Oppenheim ("SA Oppenheim"), who then conducted a digital data extraction of the phone. That same day, SA Brackett returned the phone to Peterson. See Defendant's Exhibit 2, Report of Investigation for 9/27/17 Interview.

B.    Procedural History

On October 24, 2017, the government filed a Complaint against Peterson, alleging that he violated section 922(a)(6) of title 18 of the United States Code by knowingly making a false statement to deceive a firearms dealer as to the lawfulness of the sale of a firearm. Complaint (Doc. No. 1). The government obtained an arrest warrant on the same day. Peterson was arrested on January 1, 2018, and he was released on bond on January 5, 2018.

On March 14, 2018, the Grand Jury returned a six count Indictment against Peterson. See generally Indictment (Doc. No. 24). Count One charges Peterson with conspiracy to make a false statement in connection with the sale of a firearm and to sell or dispose of a firearm to a known felon. Count Two charges him with making a false

statement during the purchase of a firearm. The remaining four counts charge Peterson with using a telephone to facilitate a drug trafficking felony.

On April 3, 2018, SA Brackett applied for and obtained a warrant to search Peterson's social media account with Snapchat (the "Snapchat Warrant"). <u>See generally</u> Defendant Exhibit D ("Snapchat Warrant") (Doc. No. 47). The Snapchat Warrant authorizes the seizure of communications and files from Peterson's Snapchat account that relate to firearms or controlled substances. <u>Id.</u>

On October 23, 2018, this court conducted an evidentiary hearing and held argument on Peterson's Motion to Suppress. At the hearing the government presented testimony from SA Brackett. Peterson did not present any witnesses. The government and the defendant each introduced a number of exhibits, including, <u>inter alia</u>, the audio recording of the officers' September 27 interview with Peterson, and the video recording of the text message exchange between Peterson and JW that SA Brackett took during the interview. <u>See generally</u> Marked Exhibit List (Doc. No. 71).

## III. DISCUSSION

Peterson argues that the officers violated his Fourth Amendment rights because (1) Peterson did not voluntarily consent to the officers' warrantless entry into his home, Def.'s Mem. at 11; (2) Peterson did not voluntarily consent to the officers' warrantless search of his cell phone, <u>id.</u> at 14; and (3) even if Peterson did voluntarily consent to having his phone searched, the officers' search for evidence relating to narcotics violated the scope of his consent, which was limited to a search for evidence relating to firearms, <u>id.</u> at 26. Peterson argues that the court should therefore suppress all statements that Peterson made to the officers during the September 27 interview and all evidence that the government obtained from Peterson's cell phone. <u>See id.</u> at 1. In

addition, Peterson seeks to suppress all evidence obtained pursuant to the Snapchat Warrant, arguing that such evidence is derivative of the officers' illegal search and seizure of Peterson's cell phone. See id. at 27.

A.     Legal Framework

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Warrantless searches and seizures in a suspect's home are generally unreasonable and therefore violate the Fourth Amendment. United States v. Garcia, 56 F.3d 418, 422 (2d Cir. 1995). However, "[b]ecause the ultimate touchstone of the Fourth Amendment is reasonableness, its warrant requirement is subject to certain reasonable exceptions." United States v. Iverson, 897 F.3d 450, 458 (2d Cir. 2018) (internal quotation marks omitted).

One well established exception is that "a warrantless entry and search are permissible if the authorities have obtained the voluntary consent of a person authorized to grant such consent." Id. The government has the burden of proving, by a preponderance of the evidence, that the consent was voluntary. United States v. Cacace, 796 F.3d 176, 189 (2d Cir. 2015). Consent is given voluntarily when it is "the product of an essentially free and unconstrained choice by its maker, as opposed to mere acquiescence in a show of authority." United States v. Moreno, 701 F.3d 64, 76 (2d Cir. 2012) (internal quotation marks and citations omitted).

The question of whether consent "was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). The standard for evaluating consent is an objective one that asks whether a reasonable

person would have believed a suspect's consent to be voluntary.  See Florida v. Jimeno, 500 U.S. 248, 251 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?"); Southerland v. Garcia, 483 F. App'x 606, 607–08 (2d Cir. 2012) ("[W]e assess [ ] consent on an objective basis.").  Courts in the Second Circuit look to a number of factors in determining the voluntariness of consent, including: (1) the age of the consenter; (2) his educational background; (3) his intelligence; (4) the length of detention; (5) the use of physical punishments or deprivations; (6) whether he was advised of his constitutional rights; (7) whether the consenter was in custody; (8) whether guns were drawn; (9) whether the consenter was frisked; (10) whether the consenter was threatened; (11) whether he was in a public area; and (12) whether he was informed that he had the option of refusing consent.  See United States v. Puglisi, 790 F.2d 240, 243–44 (2d Cir.1986).  In applying the "totality of the circumstances" test, the Supreme Court has "consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry."  Ohio v. Robinette, 519 U.S. 33, 39 (1996).

B.    Consent to Enter Peterson's Home

Peterson argues that he did not voluntarily consent to the officers' warrantless entry into his home, but rather was tricked into giving his consent by the officers' affirmative misrepresentations as to the purpose of their visit and the nature of their investigation.  Def.'s Mem. at 11.  In particular, Peterson argues that the officers led him to believe that they were investigating his reports of assault and robbery when, in fact, the real objective of their visit was to investigate him for firearms offenses.  Id. at 13–14.

Peterson asserts that, because he acquiesced to the officers' entry on the basis of this misrepresentation, he did not voluntarily consent to the officers' entering or remaining in his home.  Id.

The audio recording, however, establishes that Peterson invited the officers into his home before the officers stated the purpose of their visit.  The officers' conversation with Peterson began as follows:

> SA Brackett: Hey Tymon?
>
> Peterson: Hey, how can I help you?
>
> SA Brackett: Hey, how's it going?  Sean Brackett with ATF.  How are you?
>
> Peterson: How ya doin?
>
> SA Brackett: Hey, I'd like to ask you a few questions.  You mind if we come in for a minute?
>
> Peterson: Ummm . . . [unintelligible]
>
> SA Brackett: Cool, thanks man.  How are you doing today?
>
> Peterson: I'm doing fine.

Audio at 00:01:05 – 00:01:20; see also Audio Tr. at 001:05 – 001:13.[2]  Soon after, the audio recording captures one of the officers asking, "Mind if I sit?", and Peterson replying, "Yeah, sure."  Audio at 00:01:45 – 00:01:50.[3]  Another officer can also be heard stating, "I'll grab a seat right here."  Id.  It is only after these initial exchanges that the officers provide Peterson with any information about the reasons for their visit.

---

[2] Although the court provides citations to the government's transcript of the audio recording, all transcriptions contained in this Ruling are based on the court's own review of the audio recording, not on the government's audio transcript.

[3] The government's transcript of the audio recording does not transcribe the officers' requests to sit down.  However, these statements can clearly be heard on the recording.

Although Peterson's response to SA Brackett's request to enter the house was not clearly captured by the recorder, the rest of the recorded conversation makes clear that the officers entered the home before they made any statements about the purpose or nature of their visit. For example, SA Brackett's response – "Cool, thanks man." – suggests that Peterson had granted SA Brackett's request to enter the home, either through an inaudible verbal statement or through nonverbal conduct. See Iverson, 897 F.3d at 458 ("Consent may be express or implied."); Seifert v. Rivera, 933 F. Supp. 2d 307, 316 (D. Conn. 2013) ("The Second Circuit has consistently held that consent need not be express but may be implied from 'an individual's words, acts or conduct.'") (quoting Krause v. Penny, 837 F.2d 595, 597 (2d Cir.1988)). Nothing in this or later exchanges suggests that Peterson had refused or resisted SA Brackett's initial request to "come in for a minute." Indeed, the officers' subsequent requests to "sit" and "grab a seat" provide additional evidence that the officers had moved into Peterson's home before they made any representations about the nature of their visit.

In support of his assertion that the officers entered his home after misleading him as to the purpose of their visit, Peterson points to SA Brackett's written report of the September 27 interview, which states that Peterson invited the officers into his home after SA Brackett asked Peterson if the group could talk to him about the robbery and assault that he reported to the Connecticut State Police. See Def.'s Mem. at 4; Defendant's Exhibit 2, Report of Investigation, 9/27/17 Interview. The court, however, credits the contemporaneous evidence captured by the audio recording over the written report based on SA Brackett's recollection. For the reasons stated above, the court

finds by a preponderance of the evidence that the officers entered Peterson's home before they made any statements regarding the purpose of their visit.

Furthermore, even if the officers had informed Peterson prior to entering his home that they wanted to speak with him about his reported robbery and assault, the court would still determine that Peterson voluntarily consented to the officers' presence in his home. The Second Circuit has held that it is generally permissible for law enforcement to use "stratagem or deception" to obtain evidence without a warrant. United States v. Alejandro, 368 F.3d 130, 135 (2d Cir. 2004) (internal quotation marks omitted), supplemented, 100 F. App'x 846 (2d Cir. 2004). Thus, "the use of trickery or deception in gaining entry into a dwelling does not by itself necessarily violate a defendant's Fourth Amendment rights." United States v. Pollaro, 733 F. Supp. 2d 364, 368 (E.D.N.Y. 2010). Instead, law enforcement's use of deception is a factor that courts should consider when determining from the totality of all the circumstances whether "a defendant's will was overborne in a particular case[.]" Schneckloth, 412 U.S. at 226; see also United States v. Monzon-Luna, No. 11-CR-722 S-4 RRM, 2013 WL 6175818, at *5 (E.D.N.Y. Nov. 22, 2013) ("[T]he use of trickery and deception by law enforcement officers does not itself require or preclude a finding that an authorized person voluntarily consented to a search. Rather, the totality of all circumstances – including, naturally, the nature of the deception used – must still be considered in determining whether such consent was voluntarily given.") (internal quotation marks omitted).

District courts in this Circuit have found a suspect's consent to be involuntary where law enforcement's misrepresentation of the purpose of their visit was "so extreme . . . [that the suspect] [was] deprived of the ability to make a fair assessment of the need

to surrender his privacy." <u>Monzon-Luna</u>, 2013 WL 6175818, at *5 (internal quotation marks and alterations omitted).  For example, in <u>Montes-Reyes</u>, a law enforcement officer asked if he could enter the defendant's hotel room to search for a missing child, when the officer actually intended to search for evidence of drug dealing.  <u>See</u> <u>United States v. Montes-Reyes</u>, 547 F. Supp. 2d 281, 283 (S.D.N.Y. 2008).  The district court in that case granted the defendant's motion to suppress, reasoning that the "missing girl" ruse created a false sense of a grave emergency that deprived the defendant of his ability to fairly assess the need to surrender his privacy.  <u>Id.</u> at 291.  Likewise, in <u>Giraldo</u>, the district court found that the defendant's consent was involuntary because the officers "falsely induc[ed] fear of an imminent life-threatening danger" by claiming that they were gas company workers checking for gas leaks.  <u>United States v. Giraldo</u>, 743 F.Supp. 152, 154 (E.D.N.Y.1990).  On the other hand, courts in this Circuit have found voluntary consent in cases where law enforcement officers falsely told the suspect that they believed he was the victim of identity theft, <u>United States v. Herndon</u>, No. 3:08CR78 (PCD), 2008 WL 11410105, at *1, *2 (D. Conn. Oct. 3, 2008); or where officers told the suspect that they were searching for a stolen cell phone when, in fact, they were investigating sex trafficking, <u>Monzon-Luna</u>, 2013 WL 6175818, at *5.

In this case, it was somewhat misleading for the officers to begin their September 27 interview by asking Peterson about the assault and robbery that he reported to the Connecticut State Police.  This line of questioning concealed the real purpose of the officers' visit, which, as SA Brackett expressly stated for the audio recorder, was to "conduct an interview of Tymon Peterson regarding the straw purchase of firearms."

Audio at 00:00:00 – 00:00:15. It also created the false impression that Peterson was the victim, rather than the suspect, in the officers' investigation.

However, the degree of deception was lessened somewhat by the fact that Peterson's robbery and assault was a valid part of the officers' investigation of Peterson for firearms offenses.  According to SA Brackett's undisputed testimony at the evidentiary hearing, which this court credits, it is a common tactic among firearms traffickers to purchase firearms, sell them illegally, and then falsely report them stolen to the police in order to conceal the illegal sales.  As part of the investigation of Peterson for firearms trafficking, the officers sought to determine whether Peterson was, in fact, replacing stolen firearms when he made his purchases from Hoffman's.  Thus, while the officers may have led Peterson into falsely believing that he was the victim, rather than the suspect, in their investigation, the officers' representations that they were interested in his robbery and assault were neither false nor wholly unconnected from their investigation of Peterson for firearms offenses.  See Herndon, 2008 WL 11410105, at *2 (finding that the officers' ruse was less coercive because it was related to their actual investigation).  Nor did the officers suggest that Peterson's robbery and assault was the only subject of their investigation.  See United States v. Colon-Gentile, No. 12-CR-777 ENV, 2014 WL 2157541, at *4 (E.D.N.Y. May 23, 2014) (finding voluntary consent where law enforcement selectively revealed some, but not all, of their investigative objectives to the suspect).  Indeed, during the first few minutes of conversing with Peterson, SA Brackett specifically stated that Peterson's report of robbery and assault was "one of the things we are really interested in[.]"  Audio at 00:02:00 – 00:02:10 (emphasis added); see also Audio Tr. at 001:16 – 001:23.

Moreover, to the extent that the officers did misrepresent the purpose of their visit, there is no evidence to suggest that this misrepresentation deprived Peterson of the ability to voluntarily consent to the officers' presence in his home. Even after Peterson learned that the officers were investigating him for firearms offenses, neither he nor his mother ever raised any objection to the officers' presence in their home. Indeed, Peterson permitted SA Brackett to accompany him as he searched different rooms of his home for the trigger lock keys. Moreover, Peterson, as a 28 year-old barber who also earned income by repairing iPhones and preparing taxes for people, clearly had the capacity to understand that he was under investigation. While Peterson expressed confusion about certain aspects of the officers' investigation, such as how the investigation related to his robbery and assault, Peterson's statements demonstrate that he fully understood that the officers were investigating him for firearms offenses. Thus, given the totality of all the circumstances, the court finds that Peterson voluntarily consented to the officers entering into and remaining in his home.

C.      Consent to Search Peterson's Phone

Law enforcement conducted two warrantless searches of Peterson's phone. The first occurred during the September 27 interview, when SA Brackett took Peterson's phone and videotaped the phone's screen as he scrolled through a text message between Peterson and JW (the "September 27 Search"). The second occurred the following day when, after Peterson signed the written consent form authorizing law enforcement to search his phone, SA Oppenheim conducted a digital forensic extraction of the phone (the "September 28 Search").

Peterson argues that both searches violated his Fourth Amendment rights because his consent was not freely and voluntarily given. See Defendant's Reply in

Further Support of the Motion to Suppress ("Def.'s Reply") (Doc. No. 64) at 6, 9.  In particular, he argues that the officers coerced his consent by (1) deceiving him as to the purpose of their visit to his home; (2) threatening him with arrest; (3) threatening to deprive him of his property; and (4) informing him that they would search his phone with or without his consent.  Id. at 5.  Below, the court will address each of Peterson's arguments in the course of considering whether Peterson voluntarily consented to each of the two searches.

        1.       September 27 Search

The circumstances surrounding SA Brackett's first search of Peterson's phone clearly demonstrate that Peterson voluntarily consented to this search.  First, there is no evidence that Peterson misunderstood the nature of the officers' investigation when he permitted SA Brackett to scroll through his cell phone.  By this time, the officers had revealed their interest in Peterson's gun purchases at Hoffman's.  Prior to this search, the officers had explained on multiple occasions that they were investigating Peterson for firearms offenses.  Peterson, in turn, had demonstrated through his exchange with the officers that he understood that he was a suspect in their investigation.  At one point, for example, Peterson told the officers that he was "not trying to go to jail."  Audio at 01:22:29 – 01:22:31; see also Audio Tr. at 53:01.  Later, he expressed concern that the investigation would lead to him losing his firearms permit.  Peterson's mother, who was present when SA Brackett first searched Peterson's phone, likewise demonstrated a clear understanding of the nature and purpose of the officers' investigation.  Thus, notwithstanding Peterson's arguments to the contrary, see Def.'s Reply at 1–2, the court finds that there is no evidence to suggest that Peterson consented to the search because he was deceived as to the purpose of the officers' visit.

Furthermore, there is no evidence of coercion or deception during, and in the moments leading up to, SA Brackett's search of Peterson's phone. As detailed above, see, supra, at 5, SA Brackett asked Peterson if he could show him any text messages from JW that would corroborate Peterson's story that JW lent him money so that Peterson could purchase guns from Hoffman's. Peterson held up his phone. SA Brackett then said: "All right, hold up. Let me, can I see that?" Audio at 02:13:00 – 02:13:04; see also Audio Tr. at 86:25 – 87:18. Although Peterson's response is inaudible on the audio recording, SA Brackett testified at the hearing that he then took the phone from Peterson's hand and began scrolling through the text message thread between Peterson and JW. "It is not trickery to ask for consent to search concerning a suspect's defense to a crime but then use the evidence found in the case against him," as the "defense and the crime are obviously interrelated" and Peterson should have "kn[own] that any evidence found would pertain to both." Herndon, 2008 WL 11410105, at *3. Nor is there evidence suggesting that Peterson ever objected to SA Brackett searching his phone. Indeed, Peterson stood next SA Brackett and answered questions that SA Brackett asked regarding the nature and context of the text exchange that he was viewing.

Notwithstanding the seemingly innocuous circumstances surrounding the transfer of the phone from Peterson to SA Brackett, Peterson argues that his consent was rendered invalid by the officers' prior threats to arrest him if he did not cooperate. See Def.'s Reply at 7. As evidence of these threats, Peterson points to several statements made by the officers, including, most notably:

> SA Brackett: Right now, there is enough to issue a federal arrest warrant
> for you, which means we will bring this in front of a judge. A federal judge

will see this.  They will sign off on a federal complaint, and have you arrested
. . . . I will have no other choice but to go that route if you don't come on
board.  If you're cooperative, I mean, we can . . . take this another route.
Audio at 00:59:04 – 00:59:32; <u>see</u> <u>also</u> Audio Tr. at 36:10–36:17.

DET Martinez:  Right, so now you're taking a road that you don't want to
take. Because if we leave this house, right, and you don't try to help and
cooperate with us, guess what? The next knock you're gonna hear is going
to be us coming back with a warrant for your arrest. That's not a threat,
that's the truth.  Audio at 01:15:25 – 01:15:41; <u>see</u> <u>also</u> Audio Tr. at 48:16
– 20.

In considering whether threats to arrest render a suspect's consent involuntary,

district courts in this Circuit have generally looked to whether there was probable cause

to issue an arrest warrant.  <u>See</u> <u>United States v. Munoz</u>, 987 F. Supp. 2d 438, 447

(S.D.N.Y. 2013); <u>see</u> <u>also</u> <u>United States v. Fable</u>, No. 3:18-CR-00003 (JCH), 2018 WL

3727346, at *10 (D. Conn. July 24, 2018) (noting that "the Second Circuit has never

squarely addressed whether a threat to a third party renders a suspect's confession

involuntary").  In particular, where there exists probable cause to carry out the arrest,

they have routinely found that the threat of arrest is not coercive.  <u>See</u> <u>United States v.</u>

<u>Ortiz</u>, 943 F. Supp. 2d 447, 456–57 (S.D.N.Y. 2013) (collecting cases).  False threats of

arrest, however, may "deprive the suspect of a free and informed choice based on the

realities before him."  <u>Munoz</u>, 987 F. Supp. 2d at 447.

As the Second Circuit has explained, "[a]n officer has probable cause to arrest

where he is in possession of reasonably trustworthy information concerning facts and

circumstances sufficient to warrant a person of reasonable caution in the belief that the

person to be arrested has committed or is committing a crime."  <u>United States v. Pabon</u>,

871 F.3d 164, 174 (2d Cir. 2017) (internal quotation marks and alterations omitted),

<u>cert. denied</u>, No. 17-8331, 2018 WL 1610239 (U.S. Oct. 1, 2018).  While "probable

cause requires more than a mere suspicion of wrongdoing," Walczyk v. Rio, 496 F.3d 139, 156 (2d Cir. 2007) (internal quotation marks omitted), it is a fluid and contextual standard that requires examination of the totality of the circumstances, Pabon, 871 F.3d at 174. In applying this standard, courts must "consider the circumstances from the perspective of an objectively reasonable police officer, recognizing that the officer is entitled to draw reasonable inferences on the basis of his prior experience." Id.

In this case, the officers had probable cause to arrest Peterson at the time when they represented that they could obtain an arrest warrant for him. Prior to September 27, SA Brackett possessed video surveillance footage showing JW passing currency to Peterson at Hoffman's and pointing to firearms in the display case. SA Brackett also had testimony from the sales clerks at Hoffman's, who recounted how JW had stated that "we want" a Kahr Arms pistol and how Peterson later purchased that same firearm. Furthermore, SA Brackett had investigated JW's criminal record and determined that JW had a felony conviction, which would have made it unlawful for Peterson to have purchased a firearm on JW's behalf. During the September 27 interview, but before the officers represented that they could secure an arrest warrant for Peterson, the officers asked Peterson where he had stored the firearms, and Peterson did not provide them with a location. Based on this evidence and his experience as an ATF Agent, SA Brackett testified at the evidentiary hearing that he believed that he had probable cause to arrest Peterson at the September 27 interview. The court likewise concludes that, when the officers represented to Peterson that they could obtain an arrest warrant for him, they had amassed evidence sufficient to provide them with a probable cause basis for carrying out such an arrest.

The coerciveness of the officers' statements about securing an arrest warrant was further mitigated by the circumstances in which they were delivered, which differed noticeably from the circumstances in which courts have previously found consent to be invalid in the face of threats to arrest.  Peterson, for example, cites to <u>Bohannon</u>, where this court concluded that "the officers' threat to arrest Dickson and her sister so impacted Dickson that she lacked the ability to freely consent to the search[.]"  <u>United States v. Bohannon</u>, No. 13-CR-229(JCH), 2017 WL 1536391, at *11 (D. Conn. Apr. 28, 2017); <u>see</u> <u>also</u> Def.'s Mem. at 19.  The court found, in particular, that the threat of arrest made Dickson feel "fearful," "threatened," and "upset."  <u>Bohannon</u>, 2017 WL 1536391, at *11.  Likewise, the district court in <u>Guzman</u>, which Peterson also cites, found that "[t]he atmosphere in the [defendant's] apartment . . . was objectively coercive."  <u>United States v. Guzman</u>, 724 F. Supp. 2d 434, 442 (S.D.N.Y. 2010); <u>see</u> <u>also</u> Def.'s Mem. at 19–20.  The court further noted that the close temporal proximity between the officer's threat of arrest and the defendant's consent created "[t]he strong probability" that the defendant's consent was the product of the threat, rather than the defendant's "sober reflection on the costs and benefits of agreeing to a search[.]"  <u>Guzman</u>, 724 F. Supp. 2d at 442.

In contrast, the circumstances in this case do not evince a coercive atmosphere. As revealed by the audio recording, the officers delivered their statements about Peterson's possible arrest in a calm, rather than threatening, manner.  <u>See</u> <u>United States v. Isiofia</u>, 370 F.3d 226, 232–33 (2d Cir. 2004) (affirming the district court's finding that consent was involuntary where there was evidence that the officers yelled, used abusive language, and "demanded" the defendant's consent).  Nor does it appear,

based on the tone of Peterson's responses, that the officers' statements upset him to such a degree that he lost the ability to freely consent. Furthermore, unlike in <u>Guzman</u>, where the consent immediately followed the threat of arrest, significant time elapsed between the officers' last statement about obtaining an arrest warrant and SA Brackett's search of Peterson's phone. <u>Compare</u> Audio at 01:15:25 – 01:15:41 (last statement about arrest warrants occurring one hour and fifteen minutes into the audio recording) <u>with</u> Audio at 02:13:00 – 02:13:04 (SA Brackett's search of Peterson's phone occurring two hours and thirteen minutes into the audio recording).

For these reasons, the court finds, on the basis of the totality of all the circumstances, that Peterson voluntarily consented to SA Brackett's search of his phone during the September 27 interview.

2.      September 28 Search

Peterson argues that the officers coerced him into signing the written consent form authorizing the officers to seize and extract additional data from his cell phone. Def.'s Reply at 9–10. In particular, he argues that his free will was overridden because the officers stated or implied that (1) they would obtain a search warrant if he did not consent, Def.'s Mem. at 21; (2) they had the ability to unlock Peterson's phone without his password, <u>id.</u> at 24–25; (3) Peterson would never see his phone again if the officers had to obtain a search warrant, Def.'s Reply at 9; and (4) Peterson was no longer in control of the situation, <u>id.</u> at 8. The court addresses each of these arguments in turn, starting with the officers' representations that could and would obtain a warrant to search Peterson's cell phone if he did not consent.

As with threats to obtain an arrest warrant, "the fact that an officer states that a search warrant can be obtained does not necessarily constitute a coercive factor

negating consent[.]"  United States v. Vasquez, 638 F.2d 507, 528–29 (2d Cir. 1980).

Instead, the question of whether consent is rendered invalid by an officer's threat to

obtain a search warrant depends on whether the officer could, in fact, obtain such a

warrant.  See United States v. Munoz, 987 F. Supp. 2d 438, 444–45 (S.D.N.Y. 2013)

(collecting cases).  When an officer claims that he has a warrant to search the suspect's

home when actually he has none, the Supreme Court has held that the suspect's

consent is invalid because the officer has, in effect, announced that the suspect has no

right to resist the search.  See Bumper v. North Carolina, 391 U.S. 543, 550 (U.S.

1968).  Similarly, the Second Circuit has questioned the validity of consent when

officers have represented that they could obtain a search warrant even though they

knew that they did not have probable cause to do so.  See Vasquez, 638 F.2d at 529.

On the other hand, the Second Circuit has held that "the well founded advice of a law

enforcement agent that, absent a consent to search, a warrant can be obtained does

not constitute coercion."  United States v. Faruolo, 506 F.2d 490, 495 (2d Cir. 1974).

Thus, for example, the Court has upheld findings of consent in circumstances "where

officers stated that they could apply for a warrant and would 'no doubt' obtain one[,]"

Vasquez, 638 F.2d at 529, or where the officers' threats to obtain a search warrant were

"clearly true in light of the ample evidence of illegal activity," United States v. Calvente,

722 F.2d 1019, 1023 (2d Cir. 1983).

Here, the officers' statements that they could and would obtain a search warrant

for Peterson's phone were not coercive because they were "a fair and sensible

appraisal of the realities facing the defendant."  Faruolo, 506 F.2d at 495.  When

Peterson permitted SA Brackett to scroll through his phone during the September 27

interview, SA Brackett viewed text messages that he believed contained incriminating evidence. In particular, the text exchange between Peterson and JW contained pictures of a firearm and a pistol magazine; references to "xans," which SA Brackett testified at the evidentiary hearing is the name for a type of narcotics; and texts about buying and selling firearms and ammunition. See generally Video. SA Brackett testified that, based on his experience and training in law enforcement, these and other text messages that he viewed were evidence of illegal gun and drug transactions. Recognizing that "a law enforcement officer's experience and training may permit the officer to discern probable cause from facts and circumstances where a layman might not[,]" United States v. Babilonia, 854 F.3d 163, 178 (2d Cir. 2017) (internal quotation marks omitted), the court finds that the totality of the circumstances, including the text exchange, "indicates a fair probability" that Peterson's phone contained incriminating evidence, Walczyk, 496 F.3d at 156 ("[P]robable cause to search is demonstrated where the totality of circumstances indicates a fair probability that contraband or evidence of a crime will be found in a particular place.") (internal quotation marks omitted). Thus, as there were grounds for issuing a warrant to search Peterson's phone, the officers' accurate statements that they could and would obtain a search warrant for the phone were not unduly coercive.

Peterson also argues that, even if there was probable cause to obtain a search warrant for his phone, his consent was invalid because the officers falsely represented that they could gain access to Peterson's phone without his passcode. See Def.'s Mem. at 24–25. As support for his position, Peterson points to the Supreme Court's 2014 decision in Riley, which noted that, when phones such as Peterson's iPhone lock, "data becomes protected by sophisticated encryption that renders [the] phone all but

'unbreakable' unless police know the password." Riley v. California, 134 S. Ct. 2473, 2486 (2014). Thus, Peterson argues, the officers lied to Peterson when they stated that they would obtain a search warrant and "get into [his] phone." Def.'s Mem. at 25. Peterson also highlights the following exchange between Peterson and Detective Martinez:

> Peterson: I'm trying to help them out, but, how you gonna get my passcode? You can't get my passcode.
>
> Detective Martinez: There's ways into everything.

Audio at 02:31:43 – 02:31:50; see also Audio Tr. at 102:21 – 103:02.

While these statements may have misrepresented the difficulties of unlocking an iPhone without the passcode, there is no evidence in the record suggesting that these statements were patently false. While the Supreme Court's decision in Riley suggests that, as of 2014, iPhones were "all but unbreakable," Riley, 134 S. Ct. at 2486 (internal quotation marks omitted), Peterson does not provide evidence that iPhones remained unbreakable in 2018. SA Brackett, on the other hand, testified at the evidentiary hearing that, by 2018, law enforcement had developed tools for unlocking an iPhone without the passcode. The court credits his testimony, which finds some corroboration in a 2016 case in which the United States government initially sought a court order directing Apple Inc. to assist law enforcement agents in breaking into a password protected iPhone. See Order Compelling Apple, Inc. to Assist Agents in Search, In re Search of an Apple iPhone Seized During the Execution of a Search Warrant on a Black Lexus IS300, No. ED 15-0451M (C.D. Cal. Feb. 16, 2016). Later, however, the government withdrew its suit against Apple, representing to the court that it had "successfully accessed the data stored on [the] iPhone and therefore no longer

require[d] [ ] assistance from Apple Inc." Government's Status Report, In re Search of an Apple iPhone, No. 5:16-CM-00010 (C.D. Cal. Mar. 28, 2016). The court therefore finds that the officers' representations to Peterson that they could break into his password protected phone were not without basis.

Moreover, to the extent that the officers downplayed the difficulties of bypassing the password protections on Peterson's phone, such misrepresentations were not so extreme as to override Peterson's consent, in light of the totality of the circumstances. The officers did not deliver their statements in a threatening manner. Indeed, Peterson's mother was noticeably more forceful and more vocal than the officers in encouraging her son to divulge his passcode. See, e.g., Audio at 02:22:00 – 02:22:04 ("Sign the paper and stop this foolishness."); Audio at 02:23:10 – 02:23:16 ("Tymon, sign the paper. They're not here for all of that. Sign the paper and stop being silly."); Audio at 02:28:55 – 02:28:57 ("No, Tymon. Give them the code.").

Peterson also argues that his consent was overridden by the officers' threats that "he would never see [his] phone again" if he did not cooperate. Def.'s Reply at 9; Audio at 02:21:09 – 02:21:32. When determining whether consent is voluntary, district courts in this Circuit have considered officers' threats to damage the suspect's property, such as threats to engage in destructive searches of the suspect's home if the suspect did not give consent. See, e.g., United States v. Turner, 23 F. Supp. 3d 290, 309 (S.D.N.Y. 2014). However, such threats, by themselves, are not dispositive. See United States v. Bartee, No. 13 CR. 365 RJS, 2013 WL 6164339, at *10 (S.D.N.Y. Nov. 12, 2013). Instead, "courts look to the broader context in which the statement was

made and how it would reasonably be interpreted" in order to assess whether a defendant's free will has been overborne. Id.

In this case, Detective Martinez stated on several occasions that Peterson would "never see [his] phone again" if he did not cooperate and the officers were forced to obtain a search warrant. See, e.g., Audio at 02:21:09 – 02:21:32. As the government acknowledged at the evidentiary hearing, Detective Martinez did not have the legal authority to permanently deprive Peterson of his phone. Later in the interview, however, Detective Martinez corrected his earlier misrepresentation through the following exchange:

> Vickie Peterson: Tymon, give the phone away or you will be giving it away. Do you understand, you give it up for the night or you give it up. Period. And you don't get it back until they finish the investigation. How about that?
>
> Detective Martinez: She understands it, because that is exactly how it will happen.
>
> Vickie Peterson: Now, do you want one night, or do you want four weeks?
>
> Detective Martinez: Probably longer.
>
> Vickie Peterson: Yeah, cause it's an investigation.

Audio at 02:32:03 – 02:32:28; see also Audio Tr. at 103:09 – 103:18. This exchange, which occurred minutes before Peterson signed the written consent form, accurately represented that the officers had the authority to hold the phone in evidence during the investigation. See United States v. Ganias, 824 F.3d 199, 219 (2d Cir.), cert. denied, 137 S. Ct. 569 (2016) (noting that defendants may seek the return of property that has been either lawfully or unlawfully seized by law enforcement through Rule 41(g) of the Federal Rules of Criminal Procedure); In re Application of Madison, 687 F. Supp. 2d 103, 117 (E.D.N.Y. 2009) ("[I]n determining a Rule 41(g) motion, [the court] must

engage in a balancing test between the government's interest in the continued retention of the property and the owner's right to its use.").  The above exchange also likely helped to mitigate any lingering coercive effects that Detective Martinez's earlier misrepresentations might have had on Peterson's consent.  Cf. United States v. Snype, 441 F.3d 119, 131 (2d Cir. 2006) (finding voluntary consent where the officers took steps to restore calm after a heavily armed SWAT team forcibly entered the suspect's home, handcuffed the suspect and her boyfriend, and raised the possibility that the suspect's young daughter would be placed in protective care).  Furthermore, the court finds it noteworthy that, although Peterson's mother was present when Detective Martinez suggested that Peterson would never see his phone again if he did not cooperate, she nonetheless understood the officers as saying that they would withhold Peterson's phone for the limited duration of the case.  Her remarks are indicative, although not dispositive, of how a reasonable person would interpret the officers' representations when viewed in the broader context of the conversation.  For these reasons, the court concludes that Peterson's consent was not rendered invalid by Detective Martinez's statements that Peterson would never see his phone again if he failed to cooperate.

Finally, Peterson argues that his consent was not freely given in light of certain statements made by the officers suggesting that Peterson had lost control of the situation.  Def.'s Reply at 8.  In particular, Peterson points to statements that SA Brackett made to Peterson just prior to Peterson signing the consent form:

> SA Brackett: Let me talk to you for one second.  Come here, come here.  I don't care about the guns, the gun talk, all right?  We gotta take it.  Here's the deal.  You said you're willing to work with us, right?  All right, this is it. You gotta be on board 100 percent, ok?  We've been very nice the whole

time, because we think you're a good kid. I still think you're a good kid. But . . . what you're not understanding is that you are no longer in control, ok? There's stuff that has happened, actions that you unfortunately took, that have placed things outside of your control right now, ok? Now, I said earlier, you may lose your permit. If your story's true, the way you said it is, I don't necessarily know that will happen, ok? If you work with me, and you come onboard 100 percent with me, I will be your biggest advocate for you to talk to the US Attorney to try to not get your permit revoked, all right? I know that's important you. I can't make any promises. We can see what can happen at the end of the day . . . All right, do you understand what I'm saying?

Peterson: Yeah.

SA Brackett: All right, so are you on board? Are you gonna help us? By you helping us, I'm going to do everything to help you. . . . All right, but what you need to understand right now is you need to be on board 100 percent with us. Ok? And the best chance for us to clear your name and get this over and behind us, is for you to be 100 percent on board. Can you do that?

Peterson: Ok.

Audio 02:32:47 – 02:35:08; <u>see</u> <u>also</u> Audio Tr. at 103:25 – 105:12. Viewed within the broader context of the interview, however, SA Brackett's statement that Peterson was "no longer in control" does not refer to Peterson's decision to sign the consent form. Instead, it refers to the fact that certain aspects of the investigation lie outside of Peterson's control and direction. Earlier, Peterson had proposed on several occasions alternative directions that the investigation might take. For example, he suggested that, instead of seizing his phone and the returning the phone to Peterson at a later date, the officers could simply search his phone right then and there. At another point during the interview, Peterson proposed that, if the officers came back the next day, Peterson could give them the guns that he had purchased from Hoffman's. In response to those and other proposals, the officers repeatedly stated that Peterson could not dictate the terms or direction of the investigation, which had already been set in motion and which

had to follow certain established protocols.  SA Brackett makes this point again when he tells Peterson (1) that he is "no longer in control"; (2) that "[t]here's stuff that has happened, actions that [Peterson] unfortunately took, that have placed things outside of [Peterson's] control right now"; and (3) that if Peterson wanted to cooperate with law enforcement, he had to be "on board 100 percent."  Audio 02:32:47 – 02:35:08; see also Audio Tr. at 103:25 – 105:12.

Moreover, SA Brackett clearly conveyed through subsequent statements that Peterson still had a choice to cooperate or not.  As seen in the excerpted conversation shown above, see, supra, at 27–28, SA Brackett asked whether Peterson was "on board" to cooperate, signaling that the decision to consent or not still rested with Peterson.  Thus, to the extent that SA Brackett's earlier statements suggested that Peterson had no choice but to consent to a search of his phone, his later statements helped mitigate any coercive effects.  Accordingly, the court concludes that SA Brackett's statements that Peterson was not in control were not unduly coercive.

Instead, the totality of all the circumstances leads the court to find that Peterson voluntarily signed the consent form authorizing the officers to search his phone.  The officers certainly encouraged Peterson to give consent, stating that it was in his best interest to do so and offering to put in a good word with the prosecutor if he cooperated. However, voluntariness is not vitiated merely because law enforcement uses persuasion or offers a "good deal" to entice consent from a defendant.  Munoz, 987 F. Supp. 2d at 445.  Indeed, the officers' efforts to persuade Peterson to sign the consent form were noticeably less forceful than those of Peterson's mother, who repeatedly ordered Peterson to divulge his password and sign the consent form.  See, supra, at 25.

Nor is there evidence that the officers' demeanor was threatening or coercive. The officers did not raise their voices, use abusive language, or make any show of force. While the officers were carrying firearms, there is no evidence that this factor created an unduly coercive atmosphere. Indeed, towards the end of the interview, Peterson's mother herself remarked that the officers "[had] been as nice and as patient as possible" with Peterson. Audio 02:32:30 – 02:32:36; see also Audio Tr. at 103:20. Thus, in light of the totality of all the circumstances, the court finds that Peterson voluntarily consented to the seizure of his phone and the subsequent data extraction that law enforcement conducted on September 28.

D.    Scope of Consent

Peterson argues that, even if his consent to search was voluntarily given, any evidence on his phone relating to narcotics must be suppressed because the scope of his consent was limited to evidence relating to firearms. Def.'s Mem. at 26. At the evidentiary hearing, the government represented that the only evidence on Peterson's phone that it intends to use at trial is the text message thread between Peterson and JW (the "JW Text Thread"). As noted above, see, supra, at 5, SA Brackett videotaped a portion of the JW Text Thread during the September 27 interview. The government, however, seeks to rely on the entire thread, including portions not captured in SA Brackett's video recording.

Thus, the court need only address whether the JW Text Thread falls within the scope of Peterson's consent. To the extent that Peterson's Motion to Suppress seeks to exclude evidence not found in the JW Text Thread, the Motion is denied as moot. As discussed below, the court will also deny the Motion as it applies to the JW Text Thread because, while the court finds that Peterson's scope of consent is limited to evidence

relating to firearms, the government's seizure of narcotics evidence from the JW Text

Thread was justified under the plain view exception to the Fourth Amendment's warrant

requirement.

It is well-established that "[a] suspect may . . . delimit as he chooses the scope of

the search to which he consents." Winfield v. Trottier, 710 F.3d 49, 55 (2d Cir. 2013)

(internal quotation marks omitted). As the Supreme Court explained in Florida v.

Jimeno, "the scope of a search is generally defined by its expressed object," and "[t]he

standard for measuring the scope of a suspect's consent under the Fourth Amendment

is that of 'objective' reasonableness[.]" 500 U.S. 248, 251 (1991). Thus, courts ask

whether, based on the exchange between the officer and the suspect, a typical

reasonable person would believe that "the consent given by [the suspect] authorized

such a search for such a purpose." Winfield, 710 F.3d at 56. Although the scope of a

consent search is typically defined by the object of the search, a suspect may also limit

the scope on the basis of "time, duration, area and intensity." United States v.

Coulombe, No. 1:06CR343 (GLS), 2007 WL 4192005, at *8 (N.D.N.Y. Nov. 26, 2007).

As with voluntariness, the scope of consent is a question of fact to be evaluated under

the totality of all the circumstances. See United States v. Gandia, 424 F.3d 255, 265

(2d Cir. 2005).

In this case, the court finds that the scope of Peterson's consent was limited to

evidence on his cell phone relating to firearms because the officers repeatedly told

Peterson that they were only interested in evidence on the phone relating to firearms.

Detective Martinez, for example, stated:

> I don't care what's in [the phone] as far as other things go. Our goal is very specific, ok? It's dealing with firearms. Ok? Get a little consent form, we'll take the phone with us.

Audio at 02:19:38 – 02:19:50; <u>see</u> <u>also</u> Audio Tr. at 90:15 – 90:18. Later, when Peterson expressed concern about the officers "going through all [his] personal stuff," Audio at 02:28:54 – 02:28:57; <u>see</u> <u>also</u> Audio Tr. at 99:18 – 19; Detective Peterson again represented:

> I'm worried about the particular things on your phone. We're investigating a specific crime, and that's what I'm worried about. Ok? I'm not worried about the other stuff on your phone.

Audio at 02:29:00 – 02:29:08; <u>see</u> <u>also</u> Audio Tr. at 99:24 – 100:02. At no time did the officers represent or suggest that the objective of their search might extend beyond firearms. Nor was there any discussion of narcotics beyond SA Brackett's initial remarks that he saw some "drug talk" on Peterson's phone. Audio at 02:15:00 – 02:15:30; <u>see</u> <u>also</u> Audio Tr. at 88:18 – 88:25. Based on the verbal exchanges between the officers and Peterson, no reasonable person would conclude that the scope of Peterson's consent extended beyond firearms evidence to include evidence relating to narcotics.

In arguing that Peterson's consent did encompass evidence relating to narcotics, the government points out that Peterson signed a written consent form that expressly authorized law enforcement to search his phone for "any contraband or evidence of a crime[.]" Government's Response to Defendant's Motion to Suppress ("Government's Mem.") (Doc. No. 54) at 32–33. Several considerations, however, caution against relying on this written consent form to define the scope of Peterson's consent. To begin, the officers never advised Peterson that the consent form significantly expanded

the scope of their search to include not just evidence relating to firearms, but any evidence relating to any crime. Indeed, they actively downplayed the importance of the consent form by dismissively referring to it as "a little form that gives us consent." Audio at 02:19:00 – 02:19:09; see also Audio Tr. at 90:04 – 90:06. Nor did the officers read the form to Peterson or advise Peterson to read it himself. Indeed, it seems unlikely that Peterson had time to read the consent form in its entirety before signing it, given that, in the minutes leading up to Peterson signing the form, Peterson and the officers were talking about how Peterson needed certain phone numbers from his cell phone before the officers left with the phone.

Accordingly, the court finds that the written consent form did not expand the scope of Peterson's consent beyond searches for evidence relating to firearms. Courts in this Circuit have not treated written consent forms as dispositive of the scope of consent. See United States v. Restrepo, 890 F. Supp. 180, 197 (E.D.N.Y. 1995) ("The written consent form is inconsequential under the circumstances . . . because [the suspect] signed it without comprehending what it said about the scope of the search or his right to refuse."). Instead, the central question remains: "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Jimeno, 500 U.S. at 251. Here, the totality of the circumstances would lead the typical reasonable person to conclude that the scope of Peterson's consent was limited to evidence on his phone relating to firearms.

Nevertheless, the court concludes that, under the plain view doctrine, the officers did not violate Peterson's Fourth Amendment rights by seizing evidence from the JW Text Thread relating to narcotics. "Under the plain view doctrine, a law enforcement

33

officer may seize evidence without a warrant if (1) the officer is lawfully in a position from which the officer views an object, (2) the object's incriminating character is immediately apparent, and (3) the officer has a lawful right of access to the object." United States v. Babilonia, 854 F.3d 163, 179–80 (2d Cir. 2017) (quoting internal quotation marks and alterations omitted). As the Supreme Court has explained, "[t]he rationale of the plain-view doctrine is that if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment – or at least no search independent of the initial intrusion that gave the officers their vantage point." Minnesota v. Dickerson, 508 U.S. 366, 375 (1993); see also United States v. Delva, 858 F.3d 135, 149 (2d Cir. 2017) ("If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy.") (internal quotation marks omitted), cert. denied, 138 S. Ct. 1309 (2018). The Second Circuit has recognized that the plain view doctrine applies to digital evidence, such as electronic files stored on computers or phones. See United States v. Galpin, 720 F.3d 436, 450–51 (2d Cir. 2013)

Here, Peterson's consent provided the officers with a lawful right of access to, and a lawful vantage from which to view, the text thread between Peterson and JW. As noted above, see, supra, at 30–33, Peterson's scope of consent authorized the officers to search and seize evidence from his phone relating to firearms. SA Brackett had already viewed evidence relating to firearms when Peterson permitted SA Brackett to scroll through the JW Text Thread. Indeed, SA Brackett expressly pointed out this evidence to Peterson during the September 27 interview. Thus, a reasonable person

would believe that, at a minimum, Peterson's signing of the written consent form authorized the officers to search the entirety of the JW Text Thread for additional evidence relating to firearms. Accordingly, the first and third elements of the plain view doctrine are satisfied. See United States v. Delibac, 925 F.2d 610, 613–14 (2d Cir. 1991) (applying the plain view exception when the officers gained their vantage point by means of voluntary consent).

Furthermore, the "immediately apparent" element of the plain view exception is satisfied because the evidence relating to narcotics was plainly visible on the face of the JW Text Thread. By doing no more than scrolling through this thread, the officers came across text messages that they believed, based on their experience in law enforcement, contained references to the purchase and sale of narcotics. As a result, the court concludes that the plain view exception applies to the government's seizure of narcotics evidence from the JW Text Thread.

In making this finding, the court is mindful of the unique Fourth Amendment concerns that are raised by digital searches and seizures. Cell phones, like computers, can contain vast amounts of sensitive, personal information about the owner. See Riley v. California, 134 S. Ct. 2473, 2491 (2014) ("[A] cell phone search would typically expose to the government far more than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form – unless the phone is."). As such, "[t]he potential for privacy violations occasioned by an unbridled, exploratory search of a hard drive [or phone] is enormous." Galpin, 720 F.3d at 447. The Second Circuit has recognized that the application of the plain

view doctrine to digital searches creates "a serious risk that every warrant for electronic information will become, in effect, a general warrant, rendering the Fourth Amendment irrelevant." Id. (quoting United States v. Comprehensive Drug Testing, Inc., 621 F.3d 1162, 1176 (9th Cir.2010)). This threat arises from the fact that "there is currently no way to ascertain the content of [an electronic] file without opening it," meaning that, "by necessity, government efforts to locate particular files [relating to particular crimes] will require examining a great many other files to exclude the possibility that the sought-after data are concealed there." Id. (internal quotation marks and alterations omitted). The concern is that, "[o]nce the government has obtained authorization to search the hard drive [or phone], the government may claim that the contents of every file it chose to open were in plain view and, therefore, admissible even if they implicate the defendant in a crime not contemplated by the warrant." Id.

Such concerns, however, are not implicated in the present case. Here, the government found evidence relating to narcotics in the same file (i.e., text message thread) in which it found evidence relating to firearms. Thus, the government is not offering evidence that it obtained by "surfing" Peterson's phone. Rather, the only evidence from Peterson's phone that it seeks to offer comes from a text thread that Peterson had clearly authorized the officers to search and, indeed, had already shown part of it to the officers during the September 27 interview. See, supra, at 16–21. Under these particular facts, the court concludes that the plain view exception appropriately applies to the narcotics evidence seized from the JW Text Thread, notwithstanding the fact that Peterson's scope of consent to search his phone was limited to evidence relating to firearms.

For these reasons, the court denies Peterson's Motion to Suppress as it pertains to the entire text thread between Peterson and JW, including both the portions of the thread that Peterson permitted SA Brackett to view during the September 27 interview and the remainder of the same thread that the officers viewed after the September 28 data extraction of Peterson's phone.

E.    Snapchat Warrant

Finally, Peterson argues that any evidence obtained pursuant to the Snapchat Warrant must be suppressed because the Snapchat Warrant was predicated on evidence that the government obtained as a result of its illegal search and seizure of Peterson's phone.  See Def.'s Mem. at 27.

This argument, however, is now moot in light of the court's earlier conclusions. In his Affidavit in support of his application for the Snapchat Warrant, SA Brackett relied on evidence from the JW Text Thread.  See generally Defendant's Exhibit D (Doc. No. 47).  However, the Affidavit did not reference any other evidence from Peterson's phone.  As explained above, see, supra, at 30–37, SA Bracket did not obtain the JW Text Thread through an illegal search or seizure.  Therefore, SA Brackett could lawfully rely on the JW Text Thread to establish a probable cause basis for issuing the Snapchat Warrant.

Peterson does not point to any other deficiencies in the Snapchat Warrant, and none are apparent to the court.  The Magistrate Judge clearly had probable cause to issue the Snapchat Warrant on the basis of the JW Text Thread and additional evidence that SA Brackett obtained as a result of information contained in that thread. Accordingly, the court denies Peterson's Motion to Suppress evidence produced as a result of the Snapchat Warrant.

37

## IV.    CONCLUSION

For the foregoing reasons, Peterson's Motion to Suppress is **DENIED**.

**SO ORDERED.**

Dated at New Haven, Connecticut this 20th day of November, 2018.

/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge